# SUPREME COURT OF ARKANSAS

No. CR–15–724

| | |
|---|---|
| DARRELL NAPOLEON DENNIS<br>APPELLANT | **Opinion Delivered:** November 17, 2016 |
| V. | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [60CR-13-2207] |
| STATE OF ARKANSAS<br>APPELLEE | |
| | HONORABLE CHRIS PIAZZA, JUDGE |
| | <u>AFFIRMED</u>. |

**COURTNEY HUDSON GOODSON, Associate Justice**

A jury in the Pulaski County Circuit Court found appellant Darrell Napoleon Dennis guilty of capital murder, two counts of aggravated robbery, and two counts of kidnapping. Because the State did not seek the death penalty for the crime of capital murder, Dennis automatically received a sentence of life in prison without parole for that conviction. Upon his election to forgo sentencing by the jury, the circuit court sentenced him as an habitual offender to concurrent terms of life in prison for the remaining offenses. For reversal, Dennis contends that certain rulings made by the circuit court denied him the right to self-representation; the right of confrontation; and the right to the assistance of counsel. We affirm.

## I. *Factual Background*

Our review of the record reflects that during the early morning hours of May 10, 2013, Forrest Abrams drove his red Chevrolet Tracker to the Golden Foods store located

at 12th and Woodrow Streets in Little Rock so that Tyler Hodges could purchase cigarettes. On the parking lot, Hodges encountered a man whom he did not know and who asked Hodges for money. After buying the cigarettes, Hodges returned to Abrams's vehicle and entered the back seat. The man who had asked Hodges for money spoke with Abrams and then got into the front passenger seat of the Tracker. Abrams drove out of the parking lot and engaged in a conversation with the man about purchasing drugs. Not long thereafter, the man pointed a gun at Abrams and demanded that Abrams change places with him in the vehicle. Abrams complied, and the man drove the Tracker to a place on a street where they were met by two young black males. The men confiscated Abrams's and Hodges's wallets and forced them into another vehicle.

The man encountered at the Golden Foods store drove this second vehicle to a bank where he tried, unsuccessfully, to use Hodges's debit cards in the ATM. According to Hodges, the man became "very mad"; to placate him, Hodges told the man that he had money at his cousin's house on Booker Street. When they arrived at that location, the man told Hodges that he was holding Abrams as "collateral" and that he would kill Abrams if there was any "funny stuff." One of the younger males escorted Hodges at gunpoint to the front door of the home. When his cousin came to the door, Hodges managed to escape by quickly going inside the house. Hodges called 911 to report what had occurred.

Officer Eddie Seaton of the Little Rock Police Department responded to a call at 5:05 a.m. alerting of shots fired and a "man down" on the roadway at 11th and Woodrow Streets. There, he found Abrams, who was deceased, having been shot four times in the back. Officer Kelly Lapore located Abrams's red Tracker at 8:30 a.m. at the intersection of

Abigail and Charles Bussey Streets. The cover for the gas tank was open, and a nozzle from a gas can was inserted into the tank. Officers found a gas can nearby. Inside the Tracker, officers also discovered a note pad that had the word "Red" written on it along with a phone number.[1]

Detective Tommy Hudson investigated the homicide. Based on information provided by Hodges, he obtained still photographs from the bank taken at the ATM during the transactions involving Hodges's debit cards, which occurred at 4:36 a.m. The photos captured a vehicle, a tan Geo Prizm, as well as the driver of the car. From the photographs, Hodges identified the driver as the man from Golden Foods who had held him and Abrams at gunpoint and had kidnapped them. Hudson disseminated photographs of the driver throughout the police department. He later received information from another officer that a confidential informant had identified Dennis as the driver of the Prizm. Hudson subsequently prepared a photographic spread for Hodges to view. Hodges selected Dennis's photograph from the array.

The police located the Geo Prizm on May 22, 2013. This vehicle belonged to Edgar Brown, a homeless man who routinely slept in the car on an empty lot at the corner of 24th and Maple Streets. Edgar told Hudson that he was awakened on the morning of May 10, 2013, by two young black males. The males, whom he did not recognize, informed him that "Red" had run out of gasoline on Abigail Street, and they asked Brown to take fuel to

---

[1] At the trial, the parties stipulated that the phone number belonged to Dennis's grandmother and that Dennis used it as his contact number.

"Red." Brown stated that he drove to that street and that he saw two white males in a vehicle with "Red." When he was walking to the vehicle, a red Tracker, he saw that one of the white men, referring to Hodges, appeared to be frightened. Brown said that as he was putting gas in the tank, "Red" got into the driver's seat of the Prizm. Brown protested, and as he approached his vehicle, someone struck him in the head from behind. Brown ran away, but two young men caught up with him and demanded at gunpoint that he turn over the key to the Prizm. Brown threw the key and ran. He said that "Red" returned the Prizm to him later that morning at the empty lot. Hudson also showed Brown a photo array, and Brown selected the photo of Dennis as the man, whom he knew as "Red," who had taken his car.

Based on the investigation, the police arrested Dennis on May 23. On June 5, 2013, Alvin Cooper, a long-time informant, contacted Hudson. Cooper advised Hudson that he was on the parking lot of the Golden Foods store purchasing gas for his Suburban the morning of the abduction and that he saw there an acquaintance of his named "Red." Hudson showed Cooper a photo lineup, and Cooper chose the photo of Dennis as the man whom he knew as "Red." Hudson had also obtained videos from the store. The videos were of poor quality and "jumped around" from frame to frame. During his testimony about the video footage, Hudson stated that he could not confirm that anyone got into the Tracker and that he could not say whether someone did not. However, the video placed Abrams's Tracker and Cooper's Suburban at the store during the same time frame.

Cooper died before the trial. The prosecution moved to admit Cooper's testimony from the pretrial hearing on Dennis's motion to suppress the results of the photographic

4

lineup viewed by Cooper. The circuit court granted that request over Dennis's objection, and a transcript of Cooper's testimony from the hearing was read to the jury. Essentially, Cooper testified that he saw Dennis on the parking lot standing by the passenger side of a Tracker and that he called out to him but that Dennis did not respond. He also acknowledged that he had been paid for providing this information to the police. Before the jury, the parties stipulated that Cooper had previous convictions of possession of cocaine; two counts of hot-check violations; theft of property; and felon in possession of a firearm.

At the trial, the State also offered the testimony of Sylvester Williams. Williams had been in the Pulaski County jail with Dennis, and Williams testified that Dennis told him that he was going to beat the charges due to lack of evidence because the camera from the store did not reflect his presence. Williams also testified that Dennis expressed regret for not killing the other victim.

## II. *Self-Representation*

On appeal, Dennis first argues that the circuit court deprived him of his state and federal constitutional rights to self-representation. Dennis contends that he unequivocally invoked this right at a hearing on April 10, 2014, when he stated to the court, "Yes, sir, as of right now, I'm invoking my right to represent myself. I won't be needing Mr. James anymore on my case." He also asserts that a mental evaluation ordered by the circuit court demonstrated that he was competent and without mental disease or defect, and he argues that the circuit court at a subsequent hearing focused on the "irrelevant concerns" of his limited educational background and his lack of legal experience and training in denying his

request to proceed pro se. In response, the State contends that Dennis did not unequivocally invoke the right of self-representation.

The record reveals that a series of appointed attorneys represented Dennis over the course of the proceedings. Initially, Julia Jackson and Thomas Devine provided assistance as counsel. For reasons discussed later in this opinion, the circuit court relieved them in December 2013 upon Dennis's motion. William James next undertook the representation of Dennis. In April 2014, Dennis filed a pro se motion seeking the removal of James. The circuit court held a hearing on this motion on April 10, 2014. As Dennis points out, he did inform the circuit court at the hearing that he was invoking the right to represent himself in lieu of being represented by James. The circuit court postponed ruling on this request until after the completion of a mental evaluation requested by the prosecution.

The court revisited the matter at a hearing held on August 12, 2014. At this hearing, Dennis continued to express his dissatisfaction with James. He advised the court, "I'm to the point where I don't want to represent myself, but I feel like I'm in a position where I almost have to." Dennis added, "I dont's want to represent myself, you know, but I know I have a constitutional right to waive counsel. I know that regardless. I don't want to do that." In response, the prosecution noted that Dennis had the right to represent himself but argued that Dennis's invocation of that right was equivocal. The circuit court denied Dennis's request to relieve James. In its ruling, the circuit court explained,

> It is a serious juncture. I, and the weird thing about this issue is that like Judge Fox got reversed in *Pierce v. State*[, 362 Ark. 491, 209 S.W.3d 364 (2005)]. You know, that's a Grand Theft, you know, this is not a Capital, that's not a Capital Murder where, where there's life without possibility, and I just think the gravity of the, of the charge should make a difference on, and I know that,

you know, in the abstract, they're going to say well, you know, make a knowing waiver, it doesn't matter whether it's Capital Murder or Grand Theft, but I think the complexity and the, and the possibility of the harsher sentences weighs in on that knowing waiver.

You've got a fellow who, who got a high school diploma in prison who has very little knowledge of the criminal justice system who has made statements that seem somewhat out of bounds as far as reason goes. And if you, if you let that person go and represent themselves in this type of case, I think what you're doing is looking at, at a reversible error there.

As far as grievances, you know, and I have seen this happen so many times, you get folks that don't like their lawyers; and if you don't like the lawyer, hire your own. Can't hire his own, so he's gone through Tom Devine and Julie Jackson, who are both fantastic lawyers. And he's got another really good lawyer, and, you know, I just, it's my impression that he's, he's incapable of handling this type of case, and that he's not, can't make a knowing and voluntary waiver. And it's also my impression that, that he's got a good lawyer in Mr. James, and Mr. James is going to look at this case and decide what is in his best interest, what, the Defendant's best interest, and that's, that's the most important thing in this case. That's the most important thing to a fair trial is that he has a good lawyer and that lawyer is looking out for his interest.

In August 2014, Dennis filed additional pro se motions to remove James, stating that he desired the appointment "of new black counsel." At the hearing on this motion, Dennis made it clear that he did not wish to go forward with James. When pressed whether he was seeking to represent himself, Dennis replied, "No, sir, I want appointment of two counsels, two new counsels to represent me in this capital murder case." The circuit court granted Dennis's motion to relieve James.

Ronald Davis next entered an appearance on behalf of Dennis. In January 2015, Dennis filed pro se motions to remove him, alleging a conflict of interest because Davis's wife had served as a spokesperson for the police department concerning the case. The court granted this request.

On March 3, 2015, the circuit court conducted another hearing. The circuit court noted Dennis's previous motion for self-representation during James's tenure as his attorney, and the court stated that it was granting his motion and would have Devine return as stand-by counsel. Dennis objected on the ground that the court had previously denied that motion and that he had not renewed that request. Dennis further stated, "I'm not going to take this case without counsel," and he told the circuit court that, with regard to his request for self-representation, "I've done got it out of my mind, you know, I had got it out of my mind and my system." The circuit court then ordered that Devine would represent Dennis under the Conflicts Division. As with the previous appointments of counsel, the circuit court granted a continuance. Devine represented Dennis at the trial that began on May 18, 2015.

The Sixth Amendment to the United States Constitution, made obligatory upon the states by the Due Process Clause of the Fourteenth Amendment, guarantees an accused the right to have the assistance of counsel for his defense. *Philyaw v. State*, 288 Ark. 237, 704 S.W.2d 608 (1986) (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)). Article 2, section 10 of the Arkansas Constitution specifically provides that an accused in a criminal prosecution has the right "to be heard by himself and his counsel." However, the constitutional right to counsel is a personal right and may be waived at the pretrial stage or at trial. *Pierce v. State*, 362 Ark. 491, 209 S.W.3d 364 (2005); *Mayo v. State*, 336 Ark. 275, 984 S.W.2d 801 (1999).

In *Faretta v. California*, 422 U.S. 806 (1975), the United States Supreme Court addressed the federal constitutional right of a criminal defendant to proceed pro se. The

Court held that "in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits [traditionally associated with the right of counsel]." *Faretta*, 422 U.S. at 835. The Court further stated that, although a defendant need not have the skill and experience of a lawyer in order to competently and intelligently choose self-representation, he "should be made aware of the dangers and disadvantages of self-representation so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* In *Faretta*, the Court also concluded that a defendant's technical legal knowledge is not relevant to an assessment of his knowing exercise of the right to defend himself.

This court has long recognized the right of a defendant under our constitution to conduct his defense in a criminal trial, whether for felony or misdemeanor, if he elects to do so. *Barnes v. State*, 258 Ark. 565, 528 S.W.2d 370 (1975) (observing that the issue was first addressed in *Williams v. State*, 153 Ark. 289, 239 S.W. 1065 (1922)). A criminal defendant may invoke his right to defend himself pro se provided that (1) the request to waive the right to counsel is unequivocal and timely asserted; (2) there has been a knowing and intelligent waiver; and (3) the defendant has not engaged in conduct that would prevent the fair and orderly exposition of the issues. *Morgan v. State*, 359 Ark. 168, 195 S.W.3d 889 (2004). We observe that the United States Supreme Court has qualified the right of self-representation by holding that the federal constitution "permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [*v. United States*, 362 U.S. 402 (1960) (per curiam)] but who still suffer from severe mental illness to

the point where they are not competent to conduct trial proceedings by themselves." *Indiana v. Edwards*, 554 U.S. 164, 178 (2008).

We have previously held that the circuit court maintains a weighty responsibility in determining whether an accused has knowingly and intelligently waived his right to counsel. *Jarrett v. State*, 371 Ark. 100, 263 S.W.3d 538 (2007). Every reasonable presumption must be indulged against the waiver of fundamental constitutional rights. *Hatfield v. State*, 346 Ark. 319, 57 S.W.3d 696 (2001).

Dennis's point is well taken that the circuit court focused on the irrelevant concerns of his level of education and technical legal knowledge in its ruling at the August 2014 hearing. The court's overall remarks are troubling because the court emphasized the unsoundness of Dennis's waiver rather than the question whether the assertion of the right to self-representation was knowingly and intelligently made. In another case, such a ruling might provide cause to reverse. However, we find no reversible error here because Dennis did not unequivocally invoke the right to self-representation. Although Dennis requested to proceed pro se at the April 10, 2014 hearing in an effort to relieve James, the circuit court took that motion under advisement pending the outcome of the mental evaluation. *See Edwards*, *supra*. When the court reconvened to consider the matter after the evaluation, Dennis advised the court that he did not wish to represent himself but that he wanted James removed as his attorney. At the subsequent hearing on Dennis's renewed request to remove James, Dennis sought the appointment of other counsel, and the court granted that motion. Following the removal of Davis, Dennis openly eschewed his earlier request to proceed pro se and without counsel. We have repeatedly held that a request to proceed pro se is not

unequivocal if it is an attempt on the part of the defendant to have another attorney appointed. *Jarrett*, 371 Ark. 100, 263 S.W.3d 538; *Morgan*, 359 Ark. 168, 195 S.W.3d 889; *Collins v. State*, 338 Ark. 1, 991 S.W.2d 541 (1999). Because Dennis did not unequivocally invoke the right to represent himself, we must affirm on this point.

### III. *Testimony of Alvin Cooper*

Next, Dennis asserts that the circuit court denied the right of confrontation by allowing the pretrial testimony of Alvin Cooper to be admitted at the trial. He contends that the circuit court's reliance on *Bertrand v. State*, 363 Ark. 422, 214 S.W.3d 822 (2005), is misplaced because that decision did not address the contours of a defendant's right of confrontation following the Supreme Court's opinion in *Crawford v. Washington*, 541 U.S. 36 (2004). Dennis argues that the suppression hearing regarding Cooper's identification was not a full-fledged hearing and that the cross-examination of Cooper was limited based on an objection raised by the prosecution to another witness's testimony at the hearing. Dennis asserts that he did not have a similar motive in cross-examining Cooper at the hearing as he did at the trial and that the burdens of proof at the hearing and at trial are different. He claims that the admission of the testimony was prejudicial because it corroborated Hodges's testimony about where the initial encounter occurred. The State responds that the admission of the testimony from the prior hearing does not violate the right of confrontation and that the testimony was admissible pursuant to Rule 804(b)(1) of the Arkansas Rules of Evidence. The State also asserts that the admission of the testimony was harmless.

In *Crawford*, *supra*, the Court held that a testimonial statement cannot be admitted into evidence unless the witness is unavailable to testify and the defendant had a prior

opportunity to cross-examine the witness. Here, the witness is no longer alive and is thus not available to testify at the trial. Dennis also had a prior opportunity to cross-examine the witness. Therefore, we cannot conclude that the admission of Cooper's prior testimony stands in violation of the Confrontation Clause.

The question remains whether the testimony is admissible under Rule 804(b)(1). This rule sets out the hearsay exception for former testimony, and it provides as follows:

> (1) *Former testimony*. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

In *Bertrand*, *supra*, we stated,

> In *Proctor v. State*, 349 Ark. 648, 79 S.W.3d 370 (2002), this court retraced its jurisprudence regarding Rule 804(b)(1). We observed that the admission of prior testimony requires both the opportunity to cross-examine the witness and a similar motive to develop his or her testimony. We further noted that we have consistently held that (1) where the prior testimony was at a full-fledged proceeding, (2) where the motive to cross-examine was similar, and (3) where the witness was unavailable, the testimony was admissible under Rule 804(b)(1).

*Bertrand*, 363 Ark. at 425, 214 S.W.3d at 824. This court has also recognized that similar motive does not mean identical motive and that the inquiry is inherently factual. *Id.*

Applying these principles, we have concluded that the motive to develop testimony at a federal habeas-corpus hearing was sufficient for the admission of the testimony at trial. *Vick v. State*, 314 Ark. 618, 863 S.W.2d 820 (1993). We have approved the admission of first-trial testimony in a second trial where the same issue and motive existed for cross-examination. *Espinosa v. State*, 317 Ark. 198, 876 S.W.2d 569 (1994). This court

determined in *Scroggins v. State*, 312 Ark. 106, 848 S.W.2d 400 (1993), that previous testimony given at a suppression hearing met the requirements of the rule. On the other hand, we have found no similar motive to develop testimony at bond-reduction or bond-revocation hearings. *Beasley v. State*, 370 Ark. 238, 258 S.W.3d 728 (2007); *Proctor*, *supra*. This court has also reversed and remanded when the admission of testimony from a brief preliminary hearing was admitted at trial under the rule. *Scott v. State*, 272 Ark. 88, 612 S.W.2d 110 (1981).

In *Bertrand*, *supra*, we addressed the introduction of former testimony from a hearing to suppress a witness's photo identification of the defendant. Bertrand argued that he did not have a similar motive to develop the witness's testimony at the suppression hearing. He asserted that the suppression hearing and his trial were different in terms of what was at stake and the required burdens of proof. Bertrand also maintained that his cross-examination of the witness at the pretrial hearing was insufficient. However, we concluded that defense counsel had a similar motive for cross-examination at both proceedings. This court reasoned that counsel needed to show at both the suppression hearing and the trial that the witness was mistaken in her identification or that she was biased in some way. We also observed that, had impeachment been necessary at the trial, it would have been equally as important at the suppression hearing. This court also noted that the suppression hearing was a "full-fledged" hearing where defense counsel could have impeached the witness had he chosen to do so.

The arguments raised by Dennis are similar to those we rejected in *Bertrand*. In determining the admissibility of former testimony, our focus is on the nature of the hearing

where the prior testimony was given and whether there existed a similar motive for cross-examination. Our decision in *Bertrand* supports the circuit court's decision here, and the court's reliance on that case is not misplaced. The purpose of cross-examination in both instances was to cast doubt on the witness's identification of Dennis and to show the existence of a possible bias. As demonstrated by the record, the former testimony was elicited at a full-fledged hearing. We hold that the circuit court did not err by allowing the admission of Cooper's testimony from the suppression hearing pursuant to Rule 804(b)(1). In light of this holding, we need not consider the State's harmless-error argument.

IV. *Failure of the Court to Relieve Devine*

Dennis's final point on appeal is the contention that the circuit court erred by failing to relieve Devine as his trial counsel based on Devine's statements to the court that he was laboring under a conflict of interest. He contends that the court's refusal to relieve Devine interfered with Devine's ability to represent him and denied him assistance of counsel. Citing *Eveland v. State*, 263 Ark. 478, 566 S.W.2d 127 (1978), Dennis argues that defense counsel was in the best position to determine whether a conflict existed. In response, the State insists that no actual conflict of interest existed and that Dennis has failed to allege or demonstrate prejudice flowing from Devine's representation.

On this point, the record reflects that, when the court first relieved Jackson and Devine, it related to a criminal case in another division of the circuit court where Dennis had entered a plea while being represented by Jackson and William Luppen. Jackson stated at the time that she was not suffering from a conflict of interest, and the circuit court found none. The court simply acceded to Dennis's request to remove Jackson and Devine as his

attorneys. When Devine reentered the case to represent Dennis, Devine advised the court that a conflict existed because he was mentioned in Dennis's pro se motion to have him and Jackson relieved as counsel. The circuit court found no conflict of interest and declined to remove Devine as Dennis's attorney.

The United States Supreme Court has held that where a constitutional right to counsel exists, there is a correlative right to representation that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261 (1981). The cornerstone principle in all conflict cases is whether prejudice will result to the client as a result of the conflict of interest. *Wilburn v. State*, 346 Ark. 137, 56 S.W.3d 365 (2001). That prejudice must be real and have some demonstrable detrimental effect on the clients and not merely be abstract or theoretical. *Id.* (citing *Simmons v. Lockhart*, 915 F.2d 372 (8th Cir. 1990); *Sheridan v. State*, 331 Ark. 1, 959 S.W.2d 29 (1998)). In *Mickens v. Taylor*, 535 U.S. 162, 171 (2002), the Supreme Court stated that an "actual conflict of interest" means "a conflict that affected counsel's performance, as opposed to a mere theoretical division of loyalties." There must be a showing that the alleged conflict "actually affected the adequacy of [counsel's] representation." *Mickens*, 522 U.S. at 171. We review this issue under an abuse-of-discretion standard. *Wilburn, supra.* In the absence of a showing of prejudice, we will find no abuse of discretion in the circuit court's decision to deny counsel's motion to withdraw. *Townsend v. State*, 350 Ark. 129, 85 S.W.3d 526 (2002).

Dennis does not identify the purported conflict of interest. Nor has he alleged or demonstrated prejudice resulting from Devine's representation. We do not presume

prejudice. *Wilburn, supra.* Based on these facts, we cannot say that the circuit court abused its discretion by failing to disqualify Devine as trial counsel.

## V. *4-3(i) Review*

Because Dennis received sentences of life and life in prison without the possibility of parole, the record has been reviewed for all errors prejudicial to Dennis, as required by Arkansas Supreme Court Rule 4–3(i). No reversible error was found.

Affirmed.

HART, J., dissents.

**JOSEPHINE LINKER HART, Justice, dissenting.** I respectfully dissent. The issue regarding Mr. Dennis's desire to represent himself is not whether he preserved his argument by raising it to the circuit court, because he unquestionably did so, numerous times. Likewise, the issue is not whether Mr. Dennis obtained an unequivocal ruling on his numerous requests to represent himself, because he unquestionably was unable to do so. The sole issue is whether the circuit court went so far in thwarting Mr. Dennis's desire to represent himself as to deny him his constitutional right to do so. I contend that the answer is yes.

In *Faretta v. California*, 422 U.S. 806, 835 (1975) (footnotes omitted) (citations omitted), the Supreme Court stated,

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-

16

representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.

Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the 'ground rules' of trial procedure. We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

In forcing Faretta, under these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense. Accordingly, the judgment before us is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

Here, Mr. Dennis clearly indicated that he wanted to take over his capital-murder trial. The circuit court, however, went beyond making sure that Mr. Dennis was well informed about the consequences of forgoing assistance of counsel. In my view, he coerced Mr. Dennis into backing down and accepting a public defender.

Obviously, appointed trial counsel will likely raise more of the issues that are available to be raised in a capital-murder case. However, I question whether it is giving a defendant

due process or just process—making it more unlikely that the case will be reversed on appeal because some procedural point was missed. Lost somewhere is the fundamental truth that it was Mr. Dennis's trial, and it was his right to decide how it was to be conducted.

I would reverse and remand this case to the circuit court.

*Tinsley & Youngdahl, PLLC*, by: *Jordan B. Tinsley*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee